UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS K. HOOLEY,<br><br>        Petitioner,<br><br>v.<br><br>RUSSELL ROSS,[1]<br><br>        Respondent. | Case No. 1:16-cv-00418-REP<br>(lead case)<br><br>**ORDER** |
| THOMAS K. HOOLEY,<br><br>        Petitioner,<br><br>v.<br><br>RANDY VALLEY,<br><br>        Respondent. | Case No. 1:23-cv-00162-REP<br>(consolidated case) |

Pending before the Court in these consolidated cases is an Amended Petition for Writ of Habeas Corpus filed by Idaho state prisoner Thomas K. Hooley ("Petitioner" or "Hooley"), challenging Petitioner's state court convictions of first-degree kidnapping and aiding and abetting aggravated battery. *See* Dkt. 51. Respondent has filed a Motion for

---

[1] Respondent Russell Ross is substituted for his predecessor as warden of the facility in which Petitioner is confined. *See* Rule 2(a) of the Rules Governing § 2254 Cases; Fed. R. Civ. P. 25(d).

Summary Dismissal, arguing that all of Petitioner's claims are procedurally defaulted and that Claim 1 is noncognizable. *See* Dkt. 69. The Motion is now ripe for adjudication.

The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by Respondent. Dkt. 67; *see* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006).

The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkt. 45. Having carefully reviewed the record, including the state court record, the Court finds that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court will enter the following Order granting Respondent's Motion and dismissing this case with prejudice.

## BACKGROUND

Pursuant to 28 U.S.C. § 2254(e)(1), the following facts of Petitioner's case, set forth by the Idaho Supreme Court, are presumed correct absent clear and convincing evidence to the contrary:

> Two people kidnapped Jason Given from the Apollo Motel in Twin Falls, Idaho, on July 13, 2013. The kidnappers took Given to a secluded location near Gooding, Idaho, atop a hill that was out of sight of a road below. The kidnappers stunned Given with a "stun baton" and then bound Given's hands and feet using zip ties. They purportedly "interrogated" Given, hitting him in the face and threatening further use of the stun baton. At trial, it was disputed how long the "interrogation" lasted. Ryan Cunningham, one of the admitted kidnappers, testified the interrogation lasted about thirty to forty minutes. Given testified that no one asked him any questions but that "the torture" lasted around ten minutes. At this point, Cunningham stabbed Given twice, once in the back

of the head and once in the temple. Cunningham then cut Given's throat twice and attempted to break Given's neck, telling Given "this is for all the times you hurt her [Autumn Boyack]." Believing that Given was dead, Cunningham and his accomplice left the scene and went back to Twin Falls. Given, however, survived the incident.

At first, Given said he did not recognize his assailants. He told his rescuer and the police officers who responded to the scene that he had been "jumped" by "two white males" he did not know. It was not until five days after the attack and three days after Given had been released from the hospital that Given told the police a different version of the story about the assault. He said the names of his two kidnappers were Ryan Cunningham and Thomas Hooley. Both men were later arrested.

Detective Derrick Walker interviewed Hooley on July 30, 2013. Hooley admitted knowing both Cunningham and Given and to seeing them both on the day of Given's assault. Even so, Hooley denied traveling with Cunningham and Given to the secluded area and participating in the attack. Walker explained to Hooley that "the first one to talk gets the deal." Hooley maintained that he did not go to the secluded area, and that he was innocent. Instead, he told Walker, "I'm thinking I'm getting set up here and I ain't liking the smell of things."

Cunningham, on the other hand, struck a deal with law enforcement. In exchange for testifying against Hooley, Cunningham received what he deemed to be a "sweetheart deal" of his own creation: Rather than serving "life plus thirty" years for first degree kidnapping and aggravated battery (with a deadly weapon enhancement), in exchange for his testimony, Cunningham pleaded guilty to aggravated battery and received a unified sentence of fifteen years, with the possibility of parole after only four years.

*Hooley v. State*, 537 P.3d 1267, 1270–71 (Idaho 2023) (alteration in original).

Petitioner was charged with first-degree kidnapping and aiding and abetting aggravated battery. At trial, Cunningham "portrayed Hooley as the mastermind of the attack on Given":

> Cunningham testified that: Hooley knew of the secluded area, used the stun baton on Given, "interrogated" Given, and told Cunningham to stab Given and cut his throat. Cunningham also testified that Hooley instructed him on precisely where to stab Given. During cross-examination, Cunningham explained, "[Hooley]'s the one who told me how to do it. I had never—I never stabbed anyone before, so [Hooley]'s the one who told me how to stick it in the back of his neck and temple." And Cunningham testified that, after the assault, Hooley told him to "shut [his] mouth" and "[c]ome up with an alibi."

> Cunningham added that, when he told Given "this is for all the times you hurt her," he was referring to Autumn Boyack. At the time of the attack, Boyack and Given had a four-year-old son together. Cunningham was also intimately involved with Boyack, having met Boyack through Given. Even so, Cunningham testified that Hooley had been the one to "interrogate" Given specifically about the extent of Given's sexual relations with a different woman—with whom Hooley had apparently been romantically involved.

*Id*. at 1271 (second alteration added).

Given, the victim, testified at trial. He "corroborated the fact that Hooley was the one who used the stun baton and the fact that Cunningham was the one who stabbed him and cut his throat," but Given's account of the attack also differed from Cunningham's in several ways:

> Given testified … that except for Cunningham stating that "this is for all the times you hurt her" between the two attempts to cut Given's throat, no one spoke during the attack—not to "interrogate" him, nor to give instructions on how to stab him and cut his throat. Given further testified that

> he waited to identify the kidnappers because he knew
> Cunningham was a member of a violent white supremacist
> gang, the Aryan Peckerwoods, and he was fearful of
> retaliation by Cunningham or other members of
> Cunningham's gang.

*Id*.

Hooley's defense argument primarily "focused on the lack of credibility … of the prosecution's two eyewitnesses: Cunningham and Given. Both were felons and admitted drug addicts, and both had at least some affiliation with a white supremacist gang." *Id*. However, defense counsel could not "establish an identity for an alternate perpetrator if it was not Hooley." *Id*. The jury found Petitioner guilty.

Petitioner filed a motion for a new trial, asserting juror misconduct. After an evidentiary hearing, the trial court denied the motion. Petitioner appealed the denial of the new trial motion. (State's Lodging B-1.) The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. (State's Lodging B-4; B-6.)

More than two years later, Petitioner filed a second motion for a new trial, raising a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). (State's Lodging C-1 at 30) (filing entitled, "Motion for New Trial Based on Evidence Withheld in Violation of Brady, with attatched [sic] exhibts [sic] in support of motion."). The trial court denied the motion for a new trial as untimely. (State's Lodging C-2 at 209–210.) The Idaho Court of Appeals affirmed. (State's Lodging D-4.) After granting a petition for review (*State's Lodging D-7*), the Idaho Supreme Court also affirmed. (State's Lodging D-8.)

While the appeal from the denial of Petitioner's second motion for a new trial was pending, he returned to the trial court and filed a petition for state post-conviction relief.

The initial petition asserted claims of ineffective assistance of counsel, prosecutorial misconduct, and judicial misconduct. (State's Lodging E-1 at 8–14.) However, after several different attorneys attempted to represent Petitioner, eventually substitute counsel filed a second amended petition, which did not include Petitioner's prosecutorial misconduct and judicial misconduct claims. Rather, that petition asserted a due process claim based on the presence of the victim in the courtroom throughout the trial, claims of ineffective assistance of counsel, a claim of actual innocence, and a *Brady* claim. (*Id.* at 125–30.)

The state district court denied the post-conviction petition as untimely, with the exception of Petitioner's *Brady* claim, which the court found timely. The court also denied all of the claims on the merits. (State's Lodging E-2 at 403–21.) Over a dissent, the Idaho Supreme Court affirmed and held that the entire petition—including the *Brady* claim—was untimely. *Hooley*, 537 P.3d at 1278–80.[2] The Idaho Supreme Court did not address any of Petitioner's claims on the merits.

In the instant federal habeas corpus petition, Petitioner asserts four claims. First, Petitioner claims he is actually innocent. *Am. Pet.*, Dkt. 51, at 5. Second, Petitioner asserts the prosecutor committed misconduct by presenting the testimony of two witnesses who were "liars and perjurers." *Id.* at 6. Third, Petitioner claims the trial judge erred in the following ways: (a) allowing the prosecutor to testify as an expert witness;

---

[2] The Idaho Supreme Court issued an initial opinion affirming the dismissal of Petitioner's post-conviction claims in March 2023. The Court later denied Petitioner's petition for rehearing, but it issued a substitute opinion in October 2023. This Order's citations to the Idaho Supreme Court's post-conviction decision refer to the final substitute opinion.

(b) permitting two witnesses to testify who had been previously convicted of perjury; and

(c) denying Petitioner's request for an investigator. *Id*. at 7.

Fourth and finally, the Amended Petition asserts a *Brady* violation based on the alleged withholding of an officer safety alert. *Id*. at 8. Defense counsel had access to the alert itself before trial. However, the version of the alert subject to the *Brady* claim contained handwritten notations on it, of which defense counsel was not aware. These notations identified: (1) Cunningham as the "primary cutter" in the attack on Given; (2) Autumn Boyack as a "material witness"; and (3) another individual, Nick Rice, as a non-suspect but as member of the Aryan Nations gang. *Hooley*, 537 P.3d at 1278. Because Cunningham was also alleged to be a member of a white supremacist gang, Petitioner asserts that the alert's notation regarding Rice established a link between Cunningham and Rice, which in turn tended to show that these two gang members framed Petitioner.

## DISCUSSION

The Rules Governing Section 2254 Cases ("Habeas Rules") authorize the Court to summarily dismiss a petition for writ of habeas corpus when "it plainly appears from the face of the petition and any attached exhibits," as well as those records subject to judicial notice, "that the petitioner is not entitled to relief in the district court." Habeas Rule 4; *see* Fed. R. Evid. 201(b); *Dawson*, 451 F.3d at 551 n.1. Where appropriate, a respondent may file a motion for summary dismissal, rather than an answer. *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989).

MEMORANDUM DECISION AND ORDER - 7

In the pending Motion for Summary Dismissal, Respondent argues that Claim 1 is not cognizable and that all of Petitioner's claims are procedurally defaulted without excuse. For the reasons that follow, the Court agrees.

## 1.    Claim 1 Is Not Cognizable as an Independent Habeas Claim

In Claim 1, Petitioner asserts a freestanding claim of actual innocence. Actual innocence, however, is not a cognizable habeas claim (at least in non-capital cases like Petitioner's). *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence … have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.... This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.").

Thus, Claim 1 must be dismissed as noncognizable. However, as explained in more detail below, an assertion of actual innocence can serve as "a gateway through which a habeas petitioner [may] pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 404.

## 2.    Claims 2 through 4 are Procedurally Defaulted Without Excuse

### A.    *Procedural Default Standards of Law*

A habeas petitioner must exhaust remedies in the state courts before a federal court can grant relief on constitutional claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To do so, the petitioner must invoke one complete round of the state's established appellate review process, fairly presenting all constitutional claims to the state courts so

that they have a full and fair opportunity to correct alleged constitutional errors at each level of appellate review. *Id.* at 845. In a state that has the possibility of discretionary review in the highest appellate court, like Idaho, the petitioner must have presented the federal claims at least in a petition seeking review before that court. *Id.* at 847. "Fair presentation" requires a petitioner to describe both the operative facts and the legal theories upon which the federal claim is based. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

Raising a claim "for the first and only time in a procedural context in which its merits will not be considered" except in rare circumstances does not constitute fair presentation. *Castille v. Peoples*, 489 U.S. 346, 351 (1989). In addition, presenting a state law claim does not properly exhaust a federal claim, even if the state and federal claims are similar. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam).

General references in state court to "broad constitutional principles, such as due process, equal protection, [or] the right to a fair trial," are likewise insufficient. *See Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). For proper exhaustion, a petitioner must bring his federal claim before the state court by "explicitly" citing the federal legal basis for his claim. *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *as amended*, 247 F.3d 904 (9th Cir. 2001).

When a habeas petitioner has not fairly presented a constitutional claim to the highest state court, and the state court would now refuse to consider it because of the state's procedural rules, the claim is said to be procedurally defaulted. *Gray*, 518 U.S. at 161–62. Claims are procedurally defaulted in the following situations: (1) when a

MEMORANDUM DECISION AND ORDER - 9

petitioner has completely failed to raise a claim before the Idaho courts; (2) when a petitioner has raised a claim, but has failed to fully and fairly present it as a *federal* claim to the Idaho courts; and (3) when the Idaho courts have rejected a claim on an adequate and independent state procedural ground. *Id.*; *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"To qualify as an adequate procedural ground, a state rule must be firmly established and regularly followed." *Walker v. Martin*, 562 U.S. 307, 316 (2011) (internal quotation marks omitted). That is, the state procedural bar must be one that is "'clear, consistently applied, and well-established at the time of the petitioner's purported default.'" *Martinez v. Klauser*, 266 F.3d 1091, 1093–94 (9th Cir. 2001) (quoting *Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994)). A state procedural bar can be considered adequate even if it is a discretionary rule, and even though "the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 53, 61 (2009). A state rule's "use of an imprecise standard ... is no justification for depriving a rule's language of any meaning." *Walker*, 562 U.S. at 318 (internal quotation marks and alteration omitted).

A state procedural bar is "independent" of federal law if it does not rest on, and if it is not interwoven with, federal grounds. *Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir. 2003). A rule will not be deemed independent of federal law "if the state has made application of the procedural bar depend on an antecedent ruling on federal law such as the determination of whether federal constitutional error has been committed." *Id.* (internal quotation marks and alteration omitted).

If the state court applied an adequate and independent procedural bar, then the claim is procedurally defaulted, even if a petitioner asserts that the application of the procedural bar was erroneous under state law. Federal courts lack the authority to second-guess a state court's application of its own procedural bar in a particular case. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999) ("Federal habeas courts lack jurisdiction … to review state court applications of state procedural rules."); *Johnson v. Foster*, 786 F.3d 501, 508 (7th Cir. 2015) ("[A] federal habeas court is not the proper body to adjudicate whether a state court correctly interpreted its own procedural rules, even if they are the basis for a procedural default.").[3]

Once the state sufficiently pleads the existence of an adequate and independent state procedural bar, the burden shifts to the petitioner to establish that the rule is not adequate or is dependent on federal law. "The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the

---

[3] A rare exception exists when a state court's interpretation of state law "appears to be an obvious subterfuge to evade consideration of a federal issue," *Mullaney v. Wilbur*, 421 U.S. 684, 691 n.1 (1975) (internal quotation marks omitted), when a state court applied a procedural rule "in an erroneous and arbitrary manner," *Sivak v. Hardison*, 658 F.3d 898, 907 (9th Cir. 2011), or when, in an "exceptional" case, "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question," *Lee v. Kemna*, 534 U.S. 362, 376 (2002). A federal court may re-examine a state court's application of a state-law procedural bar only in these extraordinary cases.

rule." *Bennett*, 322 F.3d at 586. The ultimate burden to show that the procedural rule is adequate and independent, however, remains with the state.

### B.       *Claims 2, 3, and 4 Are Procedurally Defaulted*

The most straightforward manner in which to resolve the exhaustion and procedural default status of Petitioner's federal claims is to review which claims were raised and addressed on the merits in the state court appellate proceedings and compare them to the subject matter of the claims in this action.

#### i.       <u>Claims 2 and 3 Were Never Presented to the Idaho Supreme Court</u>

In Petitioner's post-conviction petition in state court, Petitioner initially asserted claims that appear to be the same as Claims 2 and 3 of the instant petition—prosecutorial and judicial misconduct. (*See* State's Lodging E-1 at 8–14.) However, the operative second amended petition, later filed by Petitioner's counsel, omitted these claims. (*Id*. at 125–30.) Therefore, Petitioner did not fairly present Claims 2 and 3 to the state courts.

#### ii.       <u>Claim 4 Was Rejected by the Idaho Supreme Court Pursuant to an Adequate State Procedural Bar</u>

Petitioner asserted Claim 4, the *Brady* claim based on the notations in the officer safety alert, in his state post-conviction petition. The trial court found the claim timely, but the Idaho Supreme Court disagreed.

Idaho has a one-year statute of limitations for post-conviction claims. That limitations period was firmly established and consistently applied at the time Petitioner filed his state post-conviction petition in 2019. *See* Idaho Code § 19-4902(a) ("An application [for post-conviction relief] may be filed at any time within one (1) year from

the expiration of the time for appeal or from the determination of an appeal or from the

determination of a proceeding following an appeal, whichever is later."); *Kriebel v. State*,

219 P.3d 1204, 1206 (Idaho Ct. App. 2009) ("[T]he failure to file a timely petition for

post-conviction relief is a basis for dismissal of the petition.").

Although *Brady* claims, like all post-conviction claims in Idaho, are generally

subject to the state's one-year statute of limitations for filing post-conviction petitions,

Idaho courts will consider such a claim—even if raised outside of that limitations

period—*if* the claim was raised within a reasonable time after discovering the *Brady*

violation. "This 'reasonable time' standard … is not a rigid rule but one [that Idaho

courts] consider[] case-by-case." *Hooley*, 537 P.3d at 1279).

Considering Petitioner's *Brady* claim, the Idaho Supreme Court applied the

"reasonable time" rule, holding that Petitioner's delay in raising the claim—five months

after discovering the alleged violation—was unreasonable. As a result, the *Brady* claim

was untimely under state law. *Id*.

Idaho's reasonable time rule applicable to *Brady* claims was thoroughly discussed

and applied in *Charboneau v. State*, 174 P.3d 870, 875 (2007) ("We agree with the

district court that there should be a reasonable time within which such claims are asserted

…, once those claims are known…. In determining what a reasonable time is for filing a

successive petition, we will simply consider it on a case-by-case basis …."). *Charboneau*

was decided in 2007, long before Petitioner's post-conviction proceedings. As a result,

the reasonable time rule was an adequate and independent basis for the Idaho Supreme

MEMORANDUM DECISION AND ORDER - 13

Court to hold that Petitioner's *Brady* claim was untimely.[4] The Court notes that, even though Idaho's reasonable-time rule is discretionary and must be applied on a case-by-case basis, that fact does not mean the rule is inadequate to bar federal review. *See Beard*, 558 U.S. at 61; *Walker*, 562 U.S. at 318.

Finally, Petitioner claims the Idaho Supreme Court's determination that Petitioner's delay in raising the *Brady* claim was incorrect. *See* Dkt. 77 at 7, 13–14. However, the Court cannot second-guess the state court's application of its own procedural bar. *See Estelle*, 502 U.S. at 67–68; *Poland*, 169 F.3d at 584. This is simply not one of the extraordinary cases in which the Court can override the state court's procedural decision. *See Mullaney*, 421 U.S. at 691 n.1 (1975); *Sivak*, 658 F.3d at 907; *Lee*, 534 U.S. at 376.

Petitioner did not fairly present Claims 2 through 4 to the Idaho Supreme Court in any of his state appellate proceedings. Because the time to do so has expired, these claims are procedurally defaulted. *See Gray*, 518 U.S. at 161–62.

### C.     *Petitioner Has Not Shown an Adequate Excuse for the Default of Claims 2, 3, and 4*

The Court's conclusion that Claims 2, 3, and 4 are defaulted does not end the inquiry. A federal district court can hear the merits of a procedurally defaulted claim, but

---

[4] As for his other state post-conviction claims, Petitioner acknowledged on appeal that the petition was filed beyond the one-year limitations period. He argued, however, that Idaho courts should adopt an actual innocence exception to the timeliness bar, similar to that applied in federal habeas cases where a claim has been defaulted (discussed in more detail below). (State's Lodging F-1 at 10–13, citing *Schlup v. Delo*, 513 U.S. 298 (1995).) The Idaho Supreme Court declined to adopt such an exception to the post-conviction statute of limitations and did not address any of Petitioner's claims on the merits. *Hooley*, 537 P.3d at 1276–80.

only if the petitioner meets one of two exceptions: (1) a showing of adequate legal cause

for the default and prejudice arising from the default; or (2) a fundamental miscarriage of

justice, which means that a constitutional violation has probably resulted in the

conviction of someone who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 488,

496 (1986); *Schlup v. Delo*, 513 U.S. 298, 329 (1995).

      i.      <u>The Cause and Prejudice Exception Does Not Apply to Petitioner's</u>
<u>Defaulted Claims</u>

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate

that some objective factor external to the defense impeded his or his counsel's efforts to

comply with the state procedural rule at issue. *Murray*, 477 U.S. at 488. To show

"prejudice," a petitioner generally bears "the burden of showing not merely that the errors

[in his proceeding] constituted a *possibility* of prejudice, but that they worked to his

*actual* and substantial disadvantage, infecting his entire [proceeding] with errors of

constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

Ineffective assistance of counsel ("IAC") may constitute cause for a default. For

example, the failure on appeal to raise a meritorious claim of trial error—or the failure at

trial to preserve a claim for appeal—may render that claim procedurally defaulted. *See*

*Edwards v. Carpenter*, 529 U.S. 446, 452 (2000) ("[I]n certain circumstances counsel's

ineffectiveness in failing properly to preserve the claim for review in state court will

suffice."). However, for IAC—whether at trial or on direct appeal—to serve as cause to

excuse a default, that IAC claim must itself have been separately presented to the state

appellate courts. *Id.* ("A claim of ineffective assistance ... generally must be presented to

the state courts as an independent claim before it may be used to establish cause for a procedural default.") (internal quotation marks and alteration omitted).

A petitioner does not have a federal constitutional right to the effective assistance of counsel during state post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). Therefore, the general rule on procedural default is that any errors of post-conviction counsel *cannot* serve as a basis for cause to excuse a petitioner's procedural default of his claims. *See Coleman*, 501 U.S. at 752.

The case of *Martinez v. Ryan*, 566 U.S. 1 (2012), established a limited exception to the *Coleman* rule. In *Martinez*, the court held that inadequate assistance of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. at 9.

The Amended Petition appears to argue that the default of Petitioner's claims was the result of ineffective assistance of post-conviction counsel. Specifically, Petitioner notes that he included some claims in the initial pro se post-conviction petition that counsel omitted from the later amended petition. However, post-conviction counsel's ineffectiveness can constitute cause only with respect to defaulted claims of ineffective assistance of trial counsel. *See Davila v. Davis*, 582 U.S. 521, 529 (2017) (holding that *Martinez* does not apply to underlying claims of ineffective assistance of direct appeal counsel); *Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (holding that *Martinez* does not apply to claims under *Brady v. Maryland*). Because Petitioner does not raise an ineffective assistance of counsel claim in the Amended Petition, post-conviction

MEMORANDUM DECISION AND ORDER - 16

counsel's alleged ineffectiveness cannot constitute cause to excuse the default of Claims 2, 3, or 4.

>        ii.        Plaintiff Has Not Shown a Miscarriage of Justice to Excuse the Procedural Default

As explained forth above, to be entitled to the application of the miscarriage-of-justice exception to procedural default, a petitioner must show actual innocence. Actual innocence in this context "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In asserting actual innocence, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A procedurally defaulted claim may be heard under the miscarriage-of-justice exception only if, "in light of all of the evidence, 'it is more likely than not that no reasonable juror would have found [the petitioner] guilty beyond a reasonable doubt.'" *United States v. Avery*, 719 F.3d 1080, 1083 (9th Cir. 2013) (quoting *Schlup*, 513 U.S. at 327). Stated another way, the petitioner must show that, but for the constitutional error, *every* reasonable juror would vote to acquit.

This is a particularly exacting standard, one that will be satisfied "only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). Indeed, cases where the actual innocence gateway standard has been satisfied have "typically involved dramatic new evidence of innocence." *Larsen v. Soto*, 742 F.3d

1083, 1096 (9th Cir. 2013). Such evidence may include new DNA evidence, or "a detailed third-party confession," that "undermine[s] the validity of the prosecution's entire case." *Sistrunk v. Armenakis*, 292 F.3d 669, 677 (9th Cir. 2002); *see House*, 547 U.S. at 540–41. The actual innocence exception is not satisfied by evidence that is merely speculative, collateral, cumulative, or "insufficient to overcome otherwise convincing proof of guilt." *Larsen*, 742 F.3d at 1096.

A court determining whether a petitioner has established actual innocence must consider "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not." *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (internal quotation marks omitted). An actual innocence analysis "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard"; in other words, the federal court must "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538-39 (2006) (internal quotation marks omitted).

In considering the actual innocence exception, a district court has the discretion to assess the reliability and probative force of the petitioner's proffer, including making some credibility determinations, if necessary. *Schlup*, 513 U.S. at 331–332. Although "habeas petitioners who assert convincing actual-innocence claims [need not] prove diligence to cross a federal court's threshold," a court "'may consider how the timing of the submission and the likely credibility of a petitioner's affiants bear on the probable reliability of evidence of actual innocence.'" *McQuiggin v. Perkins*, 569 U.S. 383, 399

(2013) (statute of limitations context) (quoting *Schlup*, 513 U.S. at 332) (alterations omitted).

Direct evidence of innocence is not necessarily required for an actual innocence gateway claim. In rare circumstances, impeachment evidence alone can satisfy the *Schlup* standard. *See Sistrunk*, 292 F.3d at 676. However, such evidence must be so compelling that it "fundamentally call[s] into question the reliability of [the petitioner's] conviction." *Id.* at 677; *see also Sawyer v. Whitley*, 505 U.S. 333, 334 (1992) ("Latter-day impeachment evidence seldom, if ever, makes a clear and convincing showing that no reasonable juror would have believed the heart of the witness' account.").

For example, a "detailed third-party confession" that "undermine[s] the validity of the prosecution's entire case" would be compelling impeachment evidence. *Sistrunk*, 292 F.3d at 677; *see also Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) (actual innocence standard met where witness whose trial testimony led to petitioner's conviction later gave a sworn confession to the crime). However, evidence that "would not have cast doubt on the first-hand account of the victim, who positively identified [the petitioner] in open court" would not. *Sistrunk*, 292 F.3d at 677. The actual innocence exception is not satisfied by evidence that is merely speculative, collateral, cumulative, or "insufficient to overcome otherwise convincing proof of guilt." *Larsen*, 742 F.3d at 1096.

The new evidence in this case consists of the following: (1) the officer safety alert that is the subject of Petitioner's *Brady* claim; and (2) affidavits of two inmates—Jody

Carr and Steven Bauer—who relayed statements of Cunningham and Given to the effect that Petitioner was framed.[5]

Having considered this new evidence individually and collectively, along with all of the trial evidence, the Court concludes Petitioner has failed to satisfy the extraordinarily high standard required to excuse the procedural default of Petitioner's claims.

As explained above, the officer safety alert contained handwritten notations. One notation identified Cunningham as the "primary cutter." This evidence is merely cumulative of the evidence adduced at trial: Cunningham admitted, and Given corroborated, that Cunningham was the one who stabbed Given.

Other notations (1) identified Autumn Boyack—the person whom the attackers identified as having been hurt by Given as motive for the attack—as a material witness to the attack; and (2) identified another person, Nick Rice, as a member of the Aryan Nations gang but stated he was not a suspect in the attack. Petitioner asserts these notations show that Boyack was involved in the attack and that Rice and Cunningham were linked as both being members of a white supremacist gang. Petitioner seems to

---

[5] With his response brief, Petitioner submitted another affidavit from Jody Carr. *See* Dkt. 77 at ECF p.24. In addition to making legal arguments and repeating the allegations described in his earlier affidavit, the second Carr affidavit attaches two affidavits of Ryan Cunningham. The Cunningham affidavits were apparently submitted in a civil rights case filed by Carr and do not have anything to do with Petitioner's criminal case. Carr submitted these affidavits only to show that he was housed with Cunningham during his incarceration and that he and Cunningham were close. These materials do not show that Petitioner is actually innocent.

claim that, as a result, the notations on the officer safety report tend to show that Rice, Boyack, and Cunningham committed the crime and framed Petitioner for it.

Even assuming Rice and Cunningham were in the same gang or were otherwise acquainted, the Court cannot take the giant leap suggested by Plaintiff and construe this connection as evidence that the two men, along with Boyack, decided to frame Petitioner. This evidence hardly "undermine[s] the validity of the prosecution's entire case," and it certainly does not cast doubt on the "first-hand account of the victim, [Given,] who positively identified [Petitioner]" as being involved in the attack. *See Sistrunk*, 292 F.3d at 677.

Jody Carr's affidavit states that, while he was incarcerated with Given, Given told him that Cunningham cut his throat, and that Given identified someone else as involved in the attack only because Cunningham said it was the only way to protect Given's wife from unrelated criminal charges. *See Ex. to Pet*., Dkt. 51-1 at ECF p.6. Given also allegedly told Carr that Given and Cunningham had "set up" someone else to take the blame for the attack on Given. *Id*. at 6–7. Carr states that Given also told him he "felt bad for setting up the guy that 'gave him a ride,' but he 'had no choice.'" *Id*. at 9.

Carr's affidavit also claims that he was incarcerated with Cunningham at one point. Carr states that Cunningham slit his cellmate's throat and later said, "That's the second throat I've slit." *Id*. at 7. Cunningham went on to tell the story of the attack on Given and admitted to cutting Given's throat.

Another inmate, Steven Bauer, claims in his affidavit that, while he was incarcerated with Cunningham, Cunningham admitted that he, Nick Rice, and Autumn

Boyack "had set up a man he called Hooley." *See Ex. to Pet.*, Dkt. 51-3 at ECF p.16.

Cunningham purportedly told Bauer that he, Rice, and Boyack had threatened Given

"with the life of his son and family if he didn't cooperate" and identify Petitioner as

involved in the attack. *Id.* at 17.

The Court finds that the inmate affidavits are neither credible nor reliable. The

statements described in the affidavit were allegedly made years ago. And, although the

fact that the affidavits contain hearsay does not prohibit the Court from considering them,

it does provide an additional reason to be skeptical of the facts described therein. Hearsay

within hearsay offers little from which the Court can infer that the declarants' statements

are reliable. The Court will not assume the truth either of the affiants' statements or of the

statements of Given and Cunningham as described by those affiants.

Finally, even if the affidavits of the inmates are truthful and accurate, the

statements described therein are, at best, impeachment evidence. Though impeachment

evidence can at times meet the actual innocence standard, it does not do so here. The

statements contained in the affidavits do not fundamentally call into question the

reliability of Petitioner's conviction. *See Sistrunk*, 292 F.3d at 677.

Even if presented with all of the evidence discussed here, a reasonable juror still

could have believed the detailed trial testimony of Given and Cunningham and found

Petitioner guilty beyond a reasonable doubt. *See Avery*, 719 F.3d at 1083. Therefore,

Petitioner cannot use the miscarriage-of-justice exception to excuse the default of his

habeas claims.

MEMORANDUM DECISION AND ORDER - 22

## CONCLUSION

For the reasons set forth above, Claim 1 is not cognizable, and Claims 2 through 4 are procedurally defaulted without excuse. Accordingly, the Court must dismiss the Petition.

## ORDER

**IT IS ORDERED:**

1.    Respondent's Motion for Summary Dismissal (Dkt. 69) is GRANTED, and the Amended Petition for Writ of Habeas Corpus is DISMISSED with prejudice.

2.    The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Habeas Rule 11. If Petitioner wishes to appeal, he must file a timely notice of appeal with the Clerk of Court. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED:  September 25, 2024

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge